## **AFFIDAVIT**

I, Todd H. Donnelly, a Special Agent with the United States Bureau of Immigration and Customs Enforcement (ICE), Department of Homeland Security, in Boston, Massachusetts, being duly sworn, depose and state:

1.    I am a Special Agent employed by the Department of Homeland Security, Bureau of Immigration and Customs Enforcement (hereinafter "ICE"). I have been an ICE Special Agent for approximately two years. I am currently assigned to the Financial Investigation Group at the office of the Special Agent-in-Charge for ICE in Boston, Massachusetts. I have been involved in financial investigations with ICE for approximately eighteen months. Prior to my employment with the Department of Homeland Security, I worked as a Police Officer for approximately nine years, two of which I spent working as a Detective. In my capacity as a Special Agent and as a Detective, I received training and have gained experience in search and seizure, search warrant applications, criminal complaints, interviewing techniques, arrest procedures, terrorism, computer crimes, money laundering, asset forfeiture and various other crimes.

2.    The information contained in this affidavit is based upon my review of documents related to this

1

investigation, including field interviews and recordings
obtained during a meeting in Quincy, Massachusetts on May
12, 2005. It does not, however, include all the information
known to me with respect to this investigation, but only
that information which is necessary to establish the
requisite probable cause.

3.    I am submitting this affidavit in support of a
criminal complaint charging MONDHER TABOUBI with:

a.    On August 10, 2004, failing to declare his
intention of traveling outside of the United States while
carrying more than $10,000.00 in United States Currency in
monetary instruments; specifically his failure to file a
Report of International Transportation of Currency or
Monetary Instruments, known as a FinCEN form 105, in
violation of 31 U.S.C. §§5316 and 5322(a), and 31 C.F.R.
§103.23;

b.    Knowingly and willfully making false
statements of material fact to special agents of the Bureau
of Immigration and Customs Enforcement agency, Department of
Homeland Security, in December 2004 and May 2005, when he
made false claims that an individual named Bouazza Rhoufiry
loaned him a portion ($7,000.00 in United States currency)
of the funds he attempted to leave the country with, in

2

violation of 18 U.S.C. §1001.

**Facts**

4.   On August 10, 2004, Customs and Border Protection (hereinafter "CBP") Officers at Boston Logan International Airport conducted outbound currency exams on passengers flying overseas aboard Lufthansa flight #423. One of the passengers questioned, Mondher TABOUBI, was informed of reporting requirements by CBP Officer Linda Brown, and then asked to declare all monies being carried for himself and or for other individuals. TABOUBI proceeded to declare $8,000, which he stated was his own. When asked if the money he was carrying included money for his two minor children, with whom he was traveling, TABOUBI replied in the affirmative.

5.   TABOUBI was then escorted to a private secondary search area and asked to produce the currency for verification purposes. TABOUBI produced $9,400 from his pants pocket, which he proclaimed was all the money he had with him. CBP Officer Brown then asked if he had any more money in the side pockets of the cargo style shorts he was wearing. TABOUBI told the officer "no," but then asked her if they could talk when she requested that he empty out the pockets. When asked a second time to empty out his shorts pockets, TABOUBI produced $10,000 from his side pockets.

3

Again TABOUBI was asked if this was all the money he had
with him, to which he replied "yes". TABOUBI was then
escorted to a CBP Office at Logan Airport. When advised
that he would be subject to a "patdown" search, TABOUBI
produced an additional $16,217 from his front cargo shorts
pocket.

6.    The ICE Duty Agent for SAC Boston, Senior Special
Agent Dennis Kelly, was notified of the incident and
responded to interview TABOUBI. During his interview with
Special Agent Kelly, TABOUBI stated that he got nervous and
lied to the CBP Officers about the amount of money he was
carrying. TABOUBI then gave Special Agent Kelly the
following breakdown with regard to the source of funds he
was transporting:

a)    $13,000 - TABOUBI's own money to be used for the
trip expenses, and to open bank accounts in Tunisia;

b)    $8,700 - money belonging to TABOUBI's live-in
girlfriend, Khaoula Bouchoucha, and was being transported to
her mother Fatouma,

c)    $6,000 - money Belonging to Naim Kasbi, and being
transported to Kasbi's cousin in Tunisia. Kasbi managed
TABOUBI's pizza business while TABOUBI was out of the
country;

4

d)   $7,000 - money belonging to a friend of Khaoula
Bouchoucha, and being transported to a friend Karima (Last
Name Unknown).

7.   On or about October 4, 2004, TABOUBI filed a
Petition for Mitigation with the Fines, Penalties, and
Forfeiture Office in Boston for the purpose of re-claiming
the seized currency.  A review of TABOUBI's petition packet
revealed a handwritten letter signed by TABOUBI, along with
copies of his 2002 and 2003 Internal Revenue Service Tax
filings.

8.   In a letter submitted by TABOUBI, he claimed that
he was unaware that he was not permitted to take more then
$10,000 in U.S. currency out of the United States, and that
he was not aware that he had to declare any amount in excess
of $10,000.  The letter also stated that TABOUBI asked the
"Officer" about his (TABOUBI's) children, stating, and
"Aren't they allowed to bring ten thousand each".  The
Officer answered that children, as minors, were not entitled
to file currency reports as adult travelers.  TABOUBI also
stated in his petition that he believed the entire incident
was a misunderstanding and that he was sorry.

9.   TABOUBI also stated in the letter that he runs a
pizza business at 1078 Dorchester Avenue, Dorchester,

5

Massachusetts. The business is named, "Theo's Pizza." He revealed the names of two friends, "Karima Berkout" and "Bouazza Rhoufiry", from whom he borrowed $5,000 and $7,000. TABOUBI wrote that he was planning to use the money to fix up his family's home in Tunisia, and to buy additional land there.

10. On December 14, 2004, ICE Special Agents Todd Donnelly and William Walker interviewed Mondher TABOUBI at his residence in Quincy, Massachusetts. When asked about the circumstances surrounding the seizure, TABOUBI gave vague and confusing responses, including unclear remarks about how much money he had taken with him for the trip. TABOUBI said that he was bringing the money with him to buy a piece of land next his family's home in Tunisia, which was for sale for the equivalent of $48,000. TABOUBI did not have any documents to support his claim, and advised that the plot of land had since been sold.

11. TABOUBI was asked about the breakdown pertaining to the currency with regard to its origin. TABOUBI initially stated that he borrowed $14,000 in U.S. currency from two friends, Bouazza Rhoufiry and Karima Berkout ($7,000 from each). TABOUBI said that he didn't get the money from Rhoufiry until he was at the airport on the day

6

of the seizure. TABOUBI also stated that he initially knew
Rhoufiry through his brother, who knew Rhoufiry from
Tunisia. TABOUBI advised that Berkout provided him
(TABOUBI) with the money at his pizza shop three or four
days before his flight. TABOUBI did not know if all the
money he received from Berkout was her own or if she may
have borrowed a portion of it from other people. TABOUBI
said that there were no stipulations attached to the loan he
received from Rhoufiry and Berkout. TABOUBI advised that
they knew he was a good person and that he would pay them
back a little at a time.

12. TABOUBI initially said that out of the money he
was carrying, approximately $16,000 belonged to him, yet was
not sure on the exact amount. TABOUBI went on to say that
whatever the difference between the amount seized and the
amount given to him by Berkout and Rhoufiry was money of his
own. ICE Special Agents was then pointed out to TABOUBI
that his petition letter, which TABOUBI examined and
confirmed that he had written, stated that Berkout had only
given him $5,000. TABOUBI advised that the petition letter
was correct and that he had forgotten what the exact amount
from Berkout was. TABOUBI said that the bulk of his own
money was taken from where he keeps it inside his home and

7

not from the bank, further advising that he may have only withdrawn around $700 from his bank account.  TABOUBI said that he has both of his personal and business accounts with Citizens Bank, yet keeps the bulk of his savings at home.

13.  On December 30, 2004 ICE Special Agents Todd Donnelly and William Walker interviewed Mondher TABOUBI for the second time. TABOUBI advised that Bouazza Rhoufiry no longer operated Bouazza's Cafe and that he was working on obtaining a statement and current contact number for him.

14.  Agents questioned TABOUBI on some of the discrepancies between his interview at the airport on August 10, 2004, and the interview taken place at his apartment on December 14, 2004.  When confronted with these inconsistencies, TABOUBI became defensive and tried to downplay the importance of the discrepancies.  TABOUBI again said that he received $5,000 from Karima Berkout, $7,000 from Bouazza Rhoufiry, and that the majority of his money was to be used to purchase land.  TABOUBI said that between $2,000 and $3,000 was for his girlfriend's family (Khaoula Bouchoucha) and that another $500 to $1,000 was for Karima Berkout's family in Tunisia.

15.  TABOUBI did not have an explanation for why he did not tell the agents about the portion of the money TABOUBI

8

alleges was for other friend's family members when he was
interviewed sixteen days prior.  Nor could TABOUBI explain
why, during his initial interview at the airport, he stated
$13,000 was his own, where as when he was questioned at his
apartment in December 2004 he advised that $23,617 belonged
to him.  TABOUBI advised that with the exception of the
$3,000 to $4,000 going to other families in Tunisia,
everything he stated to U.S. ICE at his apartment was
accurate.

16.  TABOUBI said that he did not remember what he told
the CBP Officials at the airport as to how much of the money
was his.  TABOUBI said that he told them that $3,000 to
$4,000 was for Khaoula's family.  With respect to his
statement to officials at the airport, TABOUBI went on to
state, "I lied, I'm sorry, I was confused".  TABOUBI said
that during the initial interview at Logan Airport on the
date of the seizure, he was nervous when being questioned
and that he did not remember how much money he borrowed from
acquaintances.

17.  On May 5, 2005 Special Agents Todd Donnelly and
Kyle Burns interviewed Bouazza Rhoufiry.  Rhoufiry said that
he knew TABOUBI, yet went on to explain a relationship much
different then what TABOUBI had portrayed.

18.   Rhoufiry advised that he previously owned a café in Revere, Massachusetts and that he put it up for sale in 2004 because he wasn't making enough revenue to pay his bills.   Rhoufiry said that the first time he met Mondher TABOUBI was in May or June of 2004 when TABOUBI came into Rhoufiry's cafe with a woman described as TABOUBI's wife, inquiring on the potential sale of the café.

19.   Rhoufiry said that he met with TABOUBI on a few different occasions.   Rhoufiry said that at one point they came to an agreement and that TABOUBI gave $68,000 cash as a down payment on the café. Rhoufiry advised that he wasn't comfortable with the agreement because TABOUBI did not want to get anyone involved in the sale, including any bank. TABOUBI requested that Rhoufiry allow him to make interest-free payments over the course of eight years to finish paying off the café.   The sale of the café was never consummated.

20.   In November 2004, Rhoufiry sold the café to a different individual.   Rhoufiry said that he then used some of the proceeds from the sale to pay TABOUBI back his $68,000.   Rhoufiry said when he met with TABOUBI to return his money, TABOUBI instructed him to pay the outstanding balance in increments of six ($8,000) eight thousand-dollar

10

checks, advising that needed the money in amounts less than ten thousand-dollars. TABOUBI had initially requested the payment in cash, however Rhoufiry didn't feel comfortable dealing with such large sums of cash and therefore chose to repay Rhoufiry with checks.

21.  Rhoufiry said that in November 2004, he received a call from TABOUBI advising that he (TABOUBI) was in trouble with Customs.  TABOUBI asked Rhoufiry if he could write a note saying that Rhoufiry previously worked for TABOUBI and that Rhoufiry lent him some money.  Rhoufiry told TABOUBI that he could not do that because it was illegal.  Rhoufiry advised that he had a wife and child and did not want to get mixed up in TABOUBI's problem.  Rhoufiry said that TABOUBI then got very angry stating, "I thought I could trust you". Rhoufiry stated that he had not seen or heard from TABOUBI since that time.

22.  Rhoufiry was asked again about his relationship with TABOUBI and if he knew TABOUBI or any of his relatives from Tunisia or Morocco.  Rhoufiry denied having any prior acquaintance with any relative of TABOUBI, whether in Tunisia, Morocco, or in the United States.  Rhoufiry was emphatic that he never met TABOUBI prior to the day he walked into the café in May/June 2004.  Rhoufiry said that

11

outside of the few meetings they had in regards to the sale
of the café they have never socialized.

23. On May 6, 2005 ICE Special Agents Todd Donnelly
and Kyle Burns interviewed Karima Berkout. Berkout
acknowledged that she knew Mondher TABOUBI because her
husband, Abdenhaim Kasbi, had worked for TABOUBI at Theo's
Pizza for the past three years. Berkout advised that her
husband quit his job earlier in the year because of some
differences he had with TABOUBI. Berkout also said that she
is a friend with Khaoula, who she described as TABOUBI's
wife, and stated that they talk somewhat frequently.

24. The interviewing Special Agents asked Berkout if
she ever provided a written statement on TABOUBI's behalf,
which explained that she let him borrow money. Berkout said
that TABOUBI asked her to do so, however, she refused
because she was "scared". Berkout could not explain why she
was scared, except to say that she didn't want to get
involved with the problem TABOUBI had with the government.

25. Berkout was shown the name, "Naim Kasbi" and asked
if she recognized it. This was one of the names TABOUBI
gave at the time of the seizure when making references to
who
~~that~~ provided him with money. Berkout acknowledged that it
was her husband's name and explained that "Naim" was an

12

abbreviation of his full name "Abdenhaim".

26.   On May 9 and 11, 2005, Bouazza Rhoufiry came into the Thomas O'Neill Federal Building to meet with Special Agent Todd Donnelly.  Previous arrangements were made for Rhoufiry to bring in financial documents in support of statements Rhoufiry made during the interview at his residence on May 6, 2005.  Senior Special Agent Erica Petrillo sat in on the meeting on May 9, while Senior Special Agent William Walker was present on May 11.

27.   Rhoufiry explained in greater detail the circumstances surrounding the botched deal to buy his cafe. Rhoufiry said that within a few days of TABOUBI coming in to look at the café, they came to a verbal agreement that TABOUBI would purchase the café for $320,000.  TABOUBI was to give Rhoufiry $80,000 in cash (not $68,000 as previously thought) as a down payment.  The agreement was that TABOUBI would then make $2,500 payments every month to Rhoufiry for an eight-year period.  Rhoufiry said that TABOUBI did not want to pay interest and did not want to get any banks or lawyers involved.

28.   TABOUBI followed through with the $80,000 down payment, which he gave to Rhoufiry in cash, and then proceeded to take over the everyday operation of the

13

business for approximately two weeks. After seeing the lack
of business/revenue over the two-week period, TABOUBI
decided to back out on the deal. When he asked Rhoufiry for
his money back, Rhoufiry said that he had already spent it.
It was at this time that Rhoufiry gave TABOUBI a $10,000
postdated check (check #580) as "good-faith". Rhoufiry
postdated the check for October 31, 2004, advising TABOUBI
that he would have funds in the account by that time.
Rhoufiry said that he also gave TABOUBI $3,000 in cash at
this time. It was agreed that Rhoufiry would finish paying
TABOUBI the remaining $67,000 once the café was sold.
Rhoufiry said that since he couldn't pay TABOUBI back the
entire amount, he asked his lawyer to draft an IOU letter.
The letter showed that Rhoufiry still owed TABOUBI $67,000.
The explanation and letter provided by Rhoufiry helped to
explain the "$68,000" he mentioned during the interview on
May 5, 2005.

29. Rhoufiry provided a copy of his bank statement
showing transactions from June 2004, through May 2005.
Rhoufiry also provided copies of the checks that he used to
pay back Mondher TABOUBI after the café sold in November
2004. All checks were made out from the same Citizens Bank
checking account, however not all checks were made payable

14

to Mondher TABOUBI. The following list shows a breakdown of the information found on each check:

    10/31/04, check #580, to COSTAS - $10,000

    12/10/04, check #665, to Mondher TABOUBI - $8,168

    12/10/04, check #666, to Mondher TABOUBI - $8,000

    12/10/04, check #667, to Theo's Pizza - $8,000

    12/10/04, check #668, to Mondher TABOUBI - $8,000

    12/13/04, check #669, to Porfirio Silveira - $8,000

    12/13/04, check #670, to COSTAS - $8,000

    12/13/04, check #671, to COSTAS - $8,000

    12/13/04, check #672, to Mondher TABOUBI - $8,000

    30. Rhoufiry was asked why the checks were made out to various names. Rhoufiry admitted that he gave TABOUBI the checks without filling in the payee line. Rhoufiry said that TABOUBI requested that he leave the payee line blank. Rhoufiry said that he did not want to argue with TABOUBI about it, and said that he wrote in "35 Revere St," the address of his café', at the bottom of the check to help show why the checks were written.

    31. Rhoufiry was questioned again about TABOUBI's allegations that Rhoufiry provided him with $7,000 prior to his flight to Tunisia. Rhoufiry was adamant that he never gave TABOUBI any money prior to the flight. Rhoufiry said

that he provided TABOUBI with the $10,000 check he owed him from the sale of the café, however the check was dated and cashed after TABOUBI had returned from Tunisia.

32. Rhoufiry once again went over the phone call he received from TABOUBI at the time of the seizure. Rhoufiry was not sure on the date of the call, yet believed it was the same day TABOUBI was stopped at the airport. TABOUBI told Rhoufiry that he was caught by Customs and asked Rhoufiry if he would write a letter saying the he gave money to TABOUBI prior to his trip. Rhoufiry said that he refused to help TABOUBI and that he told TABOUBI that he owned a business and would not take a chance getting caught.

33. On May 11, 2005, Bouazza Rhoufiry met with Special Agents (SA) Todd Donnelly and William Walker at Thomas O'Neill Federal building. Rhoufiry made a consensual monitored phone call to Mondher TABOUBI, which set up a (recorded) meeting with TABOUBI for the following day.

34. On May 12, 2005, a meeting took place between Bouazza Rhoufiry and Mondher TABOUBI, that was monitored and recorded. The meeting occurred outside of the Quincy Center MBTA subway stop in Quincy, Massachusetts. As a result of the meeting, several statements were made by TABOUBI which evidenced violations of 31 U.S.C. §§ 5316 and 5322(a), 31

16

C.F.R. §103.23, and 18 U.S.C. § 1001(a)(2), and other
potential federal violations.  The conversation between
TABOUBI and Rhoufiry took place in part in English and in
part in Arabic.

35.  Shortly after meeting began, TABOUBI stated to
Rhoufiry, "I told you, I'm going to say that you gave me
seven thousand ..." As the conversation continued, TABOUBI
told Rhoufiry that he wanted Rhoufiry to tell "them" that
TABOUBI came to him (Rhoufiry) asking for money, so Rhoufiry
helped him.  In response to a question posed by Rhoufiry,
TABOUBI said that he told "them" Rhoufiry gave him seven
thousand.  When Rhoufiry responded by saying, "The money I
never gave you ...", TABOUBI answered, "You gave me money
already."  A discussion ensued where both individuals talk
of the $10,000 check Rhoufiry had given TABOUBI.  At the end
of the discussion, TABOUBI agreed that he had not cashed the
check when it was first given to him because he knew
Rhoufiry didn't have the money in the bank at the time.

36.  While trying to persuade Rhoufiry that the seizure
at the airport wasn't a "big deal," TABOUBI advised Rhoufiry
that Karima Berkout gave him five thousand dollars.  TABOUBI
told Rhoufiry that Karima signed and gave him the paper, and
that "she doesn't have any trouble."

37.  Throughout the conversation, Rhoufiry continued to bring up the subject surrounding the seizure and then asked TABOUBI what he was supposed to do.  TABOUBI initially advised Rhoufiry to tell "them" that he helped TABOUBI. TABOUBI then went on to explain in more detail what Rhoufiry should say, advising him to tell them that TABOUBI did work in Rhoufiry's restaurant in 2002, helping him (Rhoufiry) to repair it.  TABOUBI coached Rhoufiry by saying that he worked for three months and earned $4,900.  TABOUBI then went on to say that out of the $7,000 Rhoufiry allegedly gave him, $4,900 was money he (Rhoufiry) owed him from the work done in the restaurant, while the remaining $2,100 was money Rhoufiry lent to TABOUBI to help him out.  TABOUBI repeated this idea to Rhoufiry on at least three separate occasions.

38.  Rhoufiry asked TABOUBI if he told "them" that he (TABOUBI) knew Rhoufiry for a long time.  TABOUBI answered "yes," Rhoufiry said, "Wow, and I met you in May."  TABOUBI then asked, "If you tell them I know the guy a long time ago, there's a problem?"

39.  Rhoufiry asked TABOUBI at different times during their conversation if TABOUBI wanted him to sign something. At one point TABOUBI replied to Rhoufiry by saying, "if you

18

want to do it, help me ... I appreciate that."

40.  At the end of the meeting Rhoufiry asked again if
TABOUBI wanted him to write "it" down.  TABOUBI answered on
three different occasions by saying "if you don't mind."
While Rhoufiry had agreed to write down the information for
TABOUBI, he ended the meeting without doing so, and by
asking TABOUBI if he could call him.

41.  On May 12, 2005 Mondher TABOUBI unexpectedly
showed up at the Thomas O'Neill Federal Building asking to
speak with Special Agent Donnelly.  TABOUBI arrived at the
building approximately two and one-half hours after his
meeting with Rhoufiry had ended.  Special Agents Donnelly
and Walker met with TABOUBI in the lobby of the building.

42.  TABOUBI had with him a document dated March 24,
2004 from "Bizerta," which TABOUBI claimed was a real estate
agency in Tunisia.  TABOUBI said that he was bringing in the
document to show that he was trying to purchase land there.
TABOUBI then advised the agents that he needed to get his
money to purchase the land.  TABOUBI was adamant that if he
didn't get his money, he was going to lose out on the
opportunity to buy the land.

43.  Special Agent Donnelly told TABOUBI that he still
needed documentation from Rhoufiry and Berkout showing where

19

TABOUBI received the money.  TABOUBI advised that Berkout's
husband no longer worked at TABOUBI's pizza shop, and that
he didn't feel comfortable going to her residence to ask her
for the letter.  Special Agent Donnelly then told TABOUBI
that during their last conversation, TABOUBI said that he
had already received the paper from Berkout.  TABOUBI then
said that he had spoken to Berkout at the time, although she
had not yet given him the letter.

44.  In reference to Rhoufiry, TABOUBI stated that he
still did not know where Rhoufiry lived and did not have
time to go look for him.  TABOUBI said that the last time he
saw Rhoufiry was in September 2004 when TABOUBI returned
from Tunisia.  In fact, ICE Agents had witnessed the meeting
between TABOUBI and Rhoufiry earlier that day.  TABOUBI said
that he paid Rhoufiry back the $2,100 he owed him.  When
Special Agent Donnelly said that he thought it was $7,000,
TABOUBI went on to explain that Rhoufiry gave him $4,900
that was owed to him prior to his trip and that the $2,100
was money Rhoufiry lent to TABOUBI just to help him out.
Special Agent Donnelly advised that this was not the way
TABOUBI had explained it during previous interviews.

45.  Special Agent Donnelly questioned TABOUBI further
about the money he allegedly received from Rhoufiry by

20

asking when he received it.  TABOUBI said that Rhoufiry came
into his pizza business on two different occasions, giving
him $3,000 one time and $4,000 the other.  Special Agent
Donnelly told TABOUBI that in the last interview TABOUBI
claimed that Rhoufiry showed up at the airport with all the
money on same day he was flying out.  TABOUBI then denied
that he ever made this statement.

46.  During the interview, TABOUBI also stated that he
first met Rhoufiry in 2002 when TABOUBI was working at the
Cleveland Circle Dunkin Donuts.  When Special Agent Donnelly
told TABOUBI that this was not consistent with what he said
in his prior interviews, TABOUBI claimed that his prior
statements must have been a misunderstanding.

47.  TABOUBI was also notified during the interview
that making false statement to a federal law enforcement
officer was in itself a crime.  Special Agent Donnelly asked
TABOUBI if he had made any false statement to Special Agent
Donnelly, to which TABOUBI replied no.

## Conclusion

48.  Based upon the above, and on my training and
experience, I have probable cause to believe that MONDHER
TABOUBI:

a)  Failed to declare his intentions of traveling

21

outside of the United States while carrying more than $10,000 in monetary instruments, in violation of 31 U.S.C. §5316 and 5322, 31 C.F.R. §103.23;

b)   Knowingly and willfully made material false statements to Special Agents of the Bureau of Immigration and Customs Enforcement, Department of Homeland Security, in December 2004 and May 2005, when he made false claims that Bouazza Rhoufiry loaned him a portion ($7,000) of the funds he attempted to leave the country with, in violation of 18 U.S.C 1001.

TODD H. DONNELLY
Special Agent
Immigration and Customs
Enforcement

Sworn before me and subscribed in my presence this 31st day of August, 2005

JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE